Kevin Laefke on behalf of Philip Scott Cannon, who, as you know, brought this action after having been wrongfully imprisoned for over 11 years for crimes that he has consistently maintained his innocence in regard to, this action has been before this court before, and after this court reversed on motions to dismiss, then we were able to take significant discovery in various cases before this court again on an appeal of a ruling on motion for summary judgment. The obvious standard on motion for summary judgment in this case and in others is that you should analyze the evidence in the light most favorable to the non-moving party, and separately, of course, in immunity, official immunity cases the defendants bear the burden to prove that this is a case that the application of absolute or qualified immunity. And yet, the trial court opinion in this case does not resolve those many inferences, fair inferences, in favor of Mr. Cannon. The trial court says at one point, well, the facts here suggest that the prosecution team engaged in a type of witness shopping that we had violated Cannon's constitutional rights and impeded the pursuit of justice. This court in no way condones the prosecution team's conduct. Yet, the trial court consistently resolves many factual inferences against the plaintiff in finding his rulings. Let me start with an example in regard to the discredited science of comparative bullet lead analysis. The trial court, for example, said in trying to judge the distinguish between the investigator, Kerry Taylor, and the detective, Bernard Krager, who helped develop this evidence, and the prosecutors who were prosecuting the case, the trial court said it was the prosecution team that communicated with the crime lab regarding CPLA, not the police investigators. That's page 17 of the trial court's opinion, but that's contradicted by many facts. Multiple testimony, declaration testimony, affidavit testimony, and a deposition testimony, for example. Counsel, even if we agree with you, what constitutional right was violated by the bullet testing procedure used? The process right under the 14th Amendment, Judge, to start with. Are you saying there was fabricated evidence? There was, well, there's two pieces of this CPLA evidence that I think is important in the context of this case. One is the evidence itself. Two is the knowledge that a methodology analysis type of testing was rejected by Oregon State Police Forensic Lab, and they didn't do that anymore. And so the investigator, Taylor, in this case, did a workaround, as you know, and made the decision himself. At this point, I chose to take his evidence. What constitutional violation is there in seeking out an expert that uses a procedure that the investigator thinks is more helpful than the police? What's the constitutional violation in that? The violation is, first from a Brady perspective, from the 14th Amendment, from a Brady perspective, there was the knowledge that OSP wouldn't do that, and that it was not accepted by OSP, Oregon State Police Forensic Lab. So is it your argument that this was not advised, that the Oregon State Police wouldn't do the procedure? Absolutely. That's argued to the trial court and argued prior in this case. The trial court, in the summary judgment argument, asked specific questions about this issue in a specific way, Judge. And yet, we responded and said, yes, this was an issue that the trial court notes in its letter of opinion, our allegation that this was a Brady violation to not dispose of something that's defensive and all that, about the OSP refusal. And you know that Investigator Taylor, who normally worked with Oregon State Police Crime Lab and Forensic Unit, said, you know, it's almost like a type of underworld type of comment. Maybe we knew they didn't do bullet bashing, and we knew someone who would. And then I approached Conrad, and he said he could do it as the investigator. There's a lot of effort, both by the defense in this case and to some extent of the trial court's opinion, to put all of these decisions at the door of the prosecutors, the prosecutors in this case. But that's just not borne out by the record here, and the efforts taken in the light most favorable to plan. For instance, Susan Gerber, attorney of the post-depiction case representing DOJ, said that CJ, being a criminal justice, either the investigator or the prosecutor, was involved in the decision-making of what evidence would be submitted to Oregon State University. Investigator Taylor knew himself from his involvement in a prior case that the science of CBLA might be available, and he's the one. And this is essentially, if you look at from the excerpt from the record, around 411 to 421 is where all this material that I'm quoting from and citing to now takes place. And I think it's important because this court's case law, and generally the case law about Missouri, the law has said, you know, when you go outside your normal procedures, that's an indication that there's a violation under, for instance, trumpet and unblocked affliction. There's two experts helping all the time. They can't find one expert to conduct the procedure in the way they think is most helpful to the presentation of the case. And they seek out other experts. I don't understand how that's a constitutional violation at all. It's a constitutional violation if you know the science is flawed. If you know your primary forensic evaluator has rejected this. So CBLA is in the record that the prosecution and the investigator knew that the science was flawed. At the time, the expert was sought. The investigator, Taylor, knew that Oregon State Police would not do the testing. But that doesn't mean that he knew it was flawed. There's only, in the light most favorable of point of fair inferences, that the investigator, Taylor, knew that his primary source for forensic testing in every case he ever handles, Oregon State Police, would not do this court, would not do this testing. Sometimes it's because it's too cutting edge. You know, that doesn't necessarily mean that it's flawed. You know, sometimes more established institutions won't go out on a limb and, you know, conduct experimental testing. So it doesn't necessarily mean it's flawed. It just means that it's not, it doesn't meet their criteria. I agree, Judge, that that's one fair inference of that evidence. But on summary judgment, in the light most favorable of plan, another fair inference is that he knew OSP wouldn't do that forensic work. You know, think about what you don't have here on this record. You don't have any declaration or any evidence from the prosecutors, from Mr. Nias, from Mr. Fisher, to say, well, that was our decision to do that. It was Investigator Taylor's decision. He knew that OSP, in his own words, didn't do bullet batching. He knew someone who would do it in a shopping. Sure, Judge, of course, in litigation, people look for an expert to support their case. But this is a civil case. It's a criminal case. And Mr. Cannon has his due process rights in using the evidence of any type, be it an expert analysis or, you know, some other form of evidence, physical evidence, what have you, that you think potentially might be flawed. You've got to tell the defense about that and break it or drop it in your blood in those cases that follow. You know, we've spent a lot of time talking about the bullet lead analysis. Obviously, that's a big issue in this case. But there are many other issues, as you know, from the briefing that support the notion that, taken into context of the whole case, there were multiple numbers of flaws. In this case, the failure to tell defense counsel again about the red cigarette lighter and the failure to let defense counsel know that that evidence had been contaminated. It could not be fingerprinted. One of the things that's not really out in the briefs that I think is significant is that it was within six weeks that that cigarette lighter, six weeks of the crime, that that cigarette lighter was mishandled. And it was before the fire marshal issued his report identifying the significance of the lighter. So there's no way that defense counsel could have ever asked that the lighter be fingerprinted. And the fact that the lighter was not fingerprinted by the state, the fact that they somehow managed to get the cigarette lighter from a sealed evidence, labeled evidence envelope, out of a locker, onto a floor, and then an officer who was part of the investigation of this case, Ruark, who was part of the initial search in this case, he just picks it up off the floor of the evidence locker and puts it in his pocket, and then he holds onto it for a while, and then when Detective Crager says, gosh, I can't find this cigarette lighter that's supposed to be in the evidence locker, it's in a sealed envelope, I don't know where it is, oh gosh, I think I've got it here, is it a red lighter? This was the only apparent evidence of ability to start a fire that was taken from the crime scene. The crime scene video would have showed it there, except, well, they never disclosed the crime scene video, and that's another piece of evidence that was never turned over. And so again, Mr. Candidate, I recommend the court to the case that I cited just in the letter we filed last week at the Supplemental Authority, this new case, well, last year from the U.S. Supreme Court, where AV came, and it talks about Brady obligations, just generally Brady applies to evidence that might undermine witness credibility, certainly the episode with the red cigarette lighter, separate from the obvious contamination of the evidence. The problem with now using that evidence is the credibility of an experienced police officer who doesn't report that, doesn't expose it to the other side, doesn't do anything about it. Again, where he says, would something have any reasonable likelihood that it could have affected the judgment of the jury, if the jury had known about the contaminated evidence, if they were to disclose evidence that, if they were to disclose the OSP, the unbiased, to do the full ethnic analysis testing, it would have had a reasonable likelihood to have an impact, again, in light of the plaintiff's Supreme Judgment. Thank you. Thank you. We have a case in court, Ms. Kendall Gore, for the Polk County, City of Dallas, defendant. And I'm going to take about ten minutes, and Ms. Furback for the Department of Justice will take the remaining five. The law in this case is pretty broad stroke law. I don't think there's much fishy there. The real questions that might come up have to do with, what are the underlying facts? So if there's some way that I can address any questions you have there, that might be the most helpful use of my time. And your first question to Mr. Lampe, your first topic that came up about the CBLA testing, I don't think there's any question that there are no Polk County, City of Dallas defendants who were really involved in that. Robert E. Kroger was assisting the DAs in preparing for trial, but he didn't even know what that was before it came up, and they had to get tested at OSU. On this same topic, there is an affidavit from a Oregon State police criminalist who says he spoke to one of the prosecutors, and he was very specific about speaking to one of the prosecutors. And it seems to me like one of the main issues here is what is the duty of law enforcement in terms of making exculpatory or impeachment evidence available to the criminal defense? It is the obligation of law enforcement to make information available to the defendants. Well, I don't think that's quite right. I think it's the obligation of law enforcement to make every bit of information available to the prosecutor. And that's the way you make it available to the defense. Yes, right, yes. So, if we show that the prosecutor had knowledge of whatever the question is, then any obligation on the part of law enforcement is true. I agree with that. But the issue is, so, I thought that the assertion was against Defendant Taylor. Yeah, you said he's a CPO. Are you saying you don't represent Defendant Taylor? I don't represent Defendant Taylor. I just wanted to be clear that there's no question that there is no Fulton County City of Dallas. Okay, so perhaps we'll discuss that particular defendant with the Department of Justice attorney. I would suggest that. A couple other things came up. And one is the crime scene video. One of the issues in Brady is whether or not the criminal defense had access or reasonably had notice of it. And in this particular case, and this is documented in the excerpt of the record and the supplemental excerpt of this, criminal defense had received five separate written notices that there was a crime scene video prior to trial beginning. And then on the second day of trial, which was the first day of testimony, Deputy Kroger justified, and they introduced the crime scene video through his testimony. So the trial went on for a month. That would have been adequate time. Even if that trial testimony were the first instance of a notice of crime scene video, there would have still been plenty of time for the criminal defense to take advantage of anything there. Are you representing the prosecutors in this case? No, the prosecutors were out early on. Absolutely. What's your response to opposing counsel's statement that the prosecutors didn't make the decision to get CBLA testing? Do you agree with that? No, not at all. And I think it's real clear that this was done during the preparation for trial phase of this. But that doesn't answer the question as to whose investigation the CBLA testing was conducted. His theory is that it wasn't the prosecutors who thought to get this testing arranged for. It was the investigator. And if the investigator did it, as opposed to the prosecutor, aren't we in a different place? Possibly. Probably. I think I'll avoid that because, again, this defendant, Taylor, who I don't represent, but where that does come out, although I think that we can show that the record is clear, that the defense got notice after written notice after written notice of the crime scene video. But here's a point where possibly absolute immunity would attach to a law enforcement officer. Deputy Kroger's testimony is that right before trial, the DA directed him to have the sound edited off of the crime scene video in order to use it as an exhibit. And so he made that happen. Now, in that case, that's a case of a law enforcement officer essentially being an errand boy for the prosecutor. And I think in that case, the process of having that tape edited for the sound, he would be entitled to absolute immunity on that. But I understand that the court doesn't look too favorably on absolute immunity for law enforcement officers, and I admit that position makes sense. The one other point that was discussed was the cigarette lighter. And there's a few things here. Plaintiff's counsel said that this lighter was found on the floor of the evidence room and, in fact, it was found in a hallway, just that hallway. But assuming we're talking about this in the context of destroyed evidence, young blood, there has to be some evidence to add faith on the part of the officer. And in this case, there simply is not. The entire episode was explained by Deputy Kroger. He went out of his way to try to find this missing evidence. He spent an extra day looking for it. He found it, or he didn't find it, he went to his supervisor, the sergeant, who's the guy that can't find this evidence. And so everything that Deputy Kroger did, there's no evidence of bad faith here. He didn't throw it away or anything like that. He was actively looking for it. So, again, if you look at that in terms of destruction of evidence, there's no bad faith. The other thing on destruction of evidence is there has to be some reasonable probability that this could have changed the outcome here. And what we're talking about is the possibility of fingerprinting a cigarette lighter to what? How in the world would anything go and help the criminal defendant in this case, regardless of the outcome of the test? Any possible outcome is really speculative there. Is there any other factual issues that you have any questions about? Judge Kohl, do you have any questions? No question here. Thank you. Thank you, counsel. Thank you. May it please the court, it is George Dirk on behalf of Special Aids, Taylor and Trooper Goha. With regard to the role of Mr. Taylor, he was not a part of the original investigation in this case. He was assigned as part of a Department of Justice team after the local prosecutor's office requested assistance with this. A criminal homicide case is obviously a stretch resource-wise for a small district attorney's office and they did ask for help. And Taylor had experience from his prior employment at the Portland Police Bureau with the comparative bulletin analysis. I think the record is clear that it was not a test that the Oregon State Police, the Oregon Police Lab did. What the evidence does show is that Oregon State University had the equipment and had a professor who knew how to and was willing to perform that test, did perform that test, and then the prosecutors obviously and not the investigators made the decisions as to who would testify at a trial. Who made the decision as to whether or not the test performed. I think it's fair to infer that Special Agent Taylor had at least some role in that. From experience, I would assume that he discussed it with the attorney he was working with. But there's no question that he knew about it from his prior employment. He knew it had been used in other cases. He thought it would be helpful here. He suggested that it be done. What about your response to opposing counsel's observation that there's no declaration from the prosecutor saying that they approved the test or requested the test and decided to have the evidence read. What's your response to that? I guess my first response would be that we had already been here to the Ninth Circuit once and all the prosecutors were dismissed from the case on absolute immunity, on a motion to dismiss before we got to this summary judgment stage. So, frankly, at least I've come from doing an affidavit in support of the investigators saying it was our decision. Frankly, I think it just didn't occur to us and I think here's why. If you look at this court's decision in KRL v. Moore, which is cited in our brief, this court has held that when an investigator is gathering evidence for purposes of prosecution, after the indictment is filed, that that investigator is, just like the prosecutor, he's so intimately associated with the judicial process of prosecuting the defendant that he's entitled to absolute immunity. Is that true? So we saw it as, because the prosecutor is entitled to immunity, the investigator working for the prosecutor is as well. Does that assume that the investigator is working at the direction of the prosecutor? In some sense I would assume yes and in some sense that's always going to be true because the investigator is not going to decide who gets on the witness stand and testifies during the trial. No one would care about this CPLA evidence had it not been used at trial. But what if the investigator went, conducted an investigation on his own without the prosecutor having directed him to do so and committed a constitutional violation? Of course, that investigator would have been entitled to absolute immunity at that point. I suspect that that would be analyzed under qualified immunity rather than absolute immunity. I don't believe that there's any, that seeking out the CPLA test in and of itself was not a constitutional violation, although in the way that science develops, it was later found, and the FBI later asked to have rigorous work done and it was found that that evidence was not scientifically valid as it had previously been thought. That occurred several years after this prosecution and so there's, there was certainly some evidence at the trial that some people thought that this was not reliable evidence. The jury heard that. But there was an observation that, there was a Brady, opposing counsel's observation that there was a Brady violation because the case was not told that Oregon State University didn't do the Willard test. Well, they certainly knew that Oregon State University did it and not the OSP Crime Lab. Were they made aware that, I thought you said Oregon State University didn't do the Willard test. OSU did the Willard test. So the Oregon State police would not do it. Was that told to the defense that Oregon State declined to do it? I don't know that there's anything to record one way or the other about that. Would that be a Brady violation if there weren't review? You know, it's hard for me to imagine how that would be produced in discovery if you take it to a different expert witness and that expert witness produces a report and you give the defense that report. Well, it's not like a piece of evidence. It's not like a memo saying, you know, to all local police departments, just let you know that OSP no longer is going to do this test or something like that right now would be a piece of evidence. But just to have knowledge of what OSP procedures are, I'm not sure it's evidence in terms of, you know, there's a lot about this plausible Brady evidence. Yeah, I don't know what you would turn over unless there were, you know, there were some saying we won't do this. Something they would know, but I'm not sure it's Brady. And there was discussion at the criminal trial about whether this was reliable or not. And some, there was evidence that some people did not consider it reliable. The person who did the analysis obviously testified that he thought it was reliable. And, you know, here's what I did. And again, it was several years later before the FBI itself said we will no longer do this analysis because we don't consider it to be reliable scientific evidence. But there's nothing in the record here to show either that Taylor or the prosecutors knew at that point that it was discredited scientific evidence as opposed to what this was about at that point. In other words, a matter of controversy. Sure. I'll call it a police forensic community. Right? As to whether it was reliable or not. Again, the question is as to whether or not there was evidence as well as the Brady evidence. Yeah, it was a matter of controversy and that did come to trial. I think that's the end of my time. Sorry. Thank you. Two points I'd like to make in rebuttal in regard to the first of the bullet-led analysis that the trial court, Judge Toshiba, stated at page 17. Plaintiffs could argue that the fact that the Oregon State Police, and if I misspoke, Judge, I apologize, it's Oregon State Police, that was the normal go-to agency for forensics for Investigator Taylor, in this case, could argue that the fact that the OSP Forensic Lab would not conduct CPLA was the exculpatory evidence that was not disposed to defense counsel. If you write a report, you say here's why we're going outside our normal program and we're going to Oregon State University because they're the only ones that do it. OSP won't do it. In what context would that be divulged? How would that come out in terms of a Brady case? The information is, there are tangible documents that are given to the defense. I think you write a report, Judge, that says we didn't follow our normal process moving to OSU. Also, do you think they have an affirmative obligation to write a report? Yes, in the context of this case, yes, they have a KPAC report that for Brady's purpose, the prosecutor has an affirmative obligation to write a report. They have an affirmative obligation to the defense, of course. Do you think they're in Oregon? No, Judge, I don't know of any case that says there's an affirmative obligation to write a report, but there's certainly an obligation to provide any exculpatory evidence. And this evidence, that this is evidence that OSP would do this work, is evidence that there is an obligation. That sounds old. That sounds old, but I can interject. I wouldn't use that procedure. Why does that make the evidence exculpatory? Because one of the key issues was the validity of the evidence that was being challenged scientifically, Judge. And so, again, the fact that the major investigative forensic entity in Oregon would not perform such testing in the light most favorable to plaintiff was important and it was an obligation to be disclosed to the defense and judge. If I could just continue the quote that I made, if I may, I'm beyond my time and I appreciate it. But in the trial court opinion, page 17, the trial judge had said it was the prosecution team that communicated with the crime lab regarding CPLA, Office of Police Investigators, as a reason to rule against plaintiff on this issue of the exculpatory evidence. And as I've stated before from the record, Exhibit 7, page 16, the Supreme Judge by response of Kerry Taylor's interview by Investigator Eric Mason and Kerry Taylor's deposition testimony, that it was not true what the trial court said or it was inaccurate. Rather, it was Kerry Taylor that had that contact with OSU investigators. Thank you. Thank you, counsel. Thank you to both counsel. All three counsel. Is this argument submitted for decision by the court? It was. Can we take a brief break before we have questions? We'll be in recess for ten minutes.
judges: Tashima, Gould, Rawlinson